IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PERFORMANCE ABATEMENT SERVICES, INC., | No. 84277-3-I |
| Appellant, | DIVISION ONE |
| v. | |
| WASHINGTON STATE DEPARTMENT OF LABOR & INDUSTRIES, | UNPUBLISHED OPINION |
| Respondent. | |

SMITH, C.J. — The Department of Labor and Industries cited Performance Abatement Services, Inc. (PAS) for a serious violation of former WAC 296-155-24609(2)(a) (2016) after an employee without fall protection fell from an elevated scaffold without a guardrail. PAS challenges two findings of fact made by the Board of Industrial Insurance appeals and by a superior court after PAS challenged the citation: (1) that PAS had actual or constructive knowledge of the violation, or could have had knowledge through the exercise of reasonable diligence; and (2) that PAS's safety procedures were inadequate due to ineffective enforcement. We conclude that both findings were supported by substantial evidence. We therefore affirm.

FACTS

On March 18, 2020, Modesto Ortiz Calderon stumbled backward off the elevated scaffold on which he was working, falling 12 or so feet before he hit the

ground. He struck his head and back, fractured his elbow and scapula, and badly injured his right hand. In pain, unable to move, he was brought to the hospital by emergency services.

Ortiz worked for PAS doing asbestos abatement and demolition. On the day of his fall, Ortiz was on a job site at Sea-Tac International Airport (Sea-Tac) working on an elevated scaffold to remove elements of the ceiling, including lights, wiring, and the sprinkler system, as a part of PAS's abatement work. He had been working on the platform for several days alongside co-workers including Joel Hernandez Meza, who was there when Ortiz fell.

The platform did not have a guardrail to prevent workers from falling, nor were they using any other fall protection system, such as personal harnesses. This contradicted PAS's written policies and trainings. Ortiz's supervisor, Nery Alejandro Cerna, was aware of the lack of a guardrail and had instructed a general contractor to construct one the day before the accident. But Cerna had not double-checked to make sure that the guardrail had actually been installed. At the beginning of the March 18 shift, he did not mention the hazard to his workers and did not recommend the use of personal harnesses.

After Ortiz's fall, the Department of Labor and Industries investigated and issued a citation for violation of Washington's worker safety regulations. Specifically, the Department cited PAS for violating the former WAC 296-155-24609(2)(a), which laid out safety regulations for fall protection at the time of the accident.

PAS appealed the citation to the Board of Industrial Insurance Appeals. An Industrial Appeals Judge (IAJ) held a trial, hearing the testimony of Ortiz, Cerna, and Hernandez, other employees and supervisors at PAS, a representative from the Department, and an expert witness who spoke to industry practice. The IAJ also admitted a collection of exhibits into evidence, including a number of pictures of the jobsite, PAS's accident prevention plan, PAS's disciplinary history, training, and daily safety checklists, among other things.

The IAJ found for the Department and dismissed PAS's affirmative defense of unpreventable employee misconduct. The IAJ's findings and conclusions were adopted without alteration by the Board, which denied PAS's petition for its review. PAS then appealed the Board's denial of review to the superior court, which also affirmed the industrial appeals judge.

PAS now appeals the superior court order to this court.

ANALYSIS

Standard of Review

RCW 49.17.150 of the Washington Industrial Safety and Health Act (WISHA), ch. 49.17 RCW, governs appeals from decisions by the Board of Industrial Insurance Appeals (BIIA). Appeals make their way to this court after they have first been reviewed by the superior court, which may modify the Board's decision—here, the superior court slightly modified one of the Board's

findings.[1] RCW 49.17.150(1). We review the Board's decision based on the record that was before the Board. Potelco, Inc. v. Dep't of Labor & Indus., 194 Wn. App. 428, 434, 377 P.3d 251 (2016). The decision's findings of fact are conclusive "if supported by substantial evidence on the record considered as a whole." RCW 49.17.150(1). "Evidence is substantial if it is enough to convince a fair-minded person of the truth of the stated premise." Shimmick Constr. Co. v. Dep't of Labor & Indus., 12 Wn. App. 2d 770, 778, 460 P.3d 192 (2020). We do not re-weigh evidence on appeal, but instead construe the evidence in the light most favorable to the prevailing party—here, that party is the Department. Shimmick, 12 Wn. App. 2d at 778. If substantial evidence supports the Board's findings, we decide de novo if those findings support the Board's conclusions of law. Potelco, 194 Wn. App. at 434.

## Knowledge of the Violation

PAS first asserts that the Board's finding that it knew of the violation is unsupported by substantial evidence. The finding, as modified by the superior court, reads: "[PAS] knew, or with the exercise of reasonable diligence could have known, of the presence of the violation by verifying the [general contractor] had installed the guard railing as directed." In order for PAS to be correct and reversal to be warranted, it must demonstrate that this finding was not supported

---

[1] The finding was originally "PAS knew, or with the exercise of reasonable diligence could have known, of the presence of the violation." To this the superior court added "by verifying that the [general contractor] had installed the guard railing as directed."

by substantial evidence, which would mean that the Department failed to prove each element of its case. However, we conclude that this finding is supported by substantial evidence.

The Department cited PAS for a serious violation of former WAC 296-155-24609(2)(a).[2] That regulation concerned fall protection, requiring employers to

> Guard[] . . . [e]very open sided walking/working surface or platform four feet or more above adjacent floor or ground level . . . by one of the following fall protection systems.
>
>> (a) A standard guardrail system. . . .
>> (b) A fall restraint system;
>> (c) A personal fall arrest system;
>> (d) A safety net system;
>> (e) A catch platform; and
>> (f) A warning line.

Former WAC 296-155-24609(2)(a)-(f). For the Department to prove a serious violation of a health and safety standard, it must show that " '(1) the cited standard applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; . . . (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition;' " and (5) there is a substantial probability that death or serious physical harm could result from the condition. SuperValu, Inc. v. Dep't of Labor & Indus., 158 Wn.2d 422, 433 n. 7, 144 P.3d 1160 (2006) (quoting

---

[2] The code, which was effective through October 1, 2020 and therefore governed PAS's worksite at Sea-Tac at the time of this accident in March 2020, has since been updated.

5

Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 119 Wn. App. 906, 914, 83 P.3d 1012 (2004)); RCW 49.17.180(7).

Here, PAS contests the sufficiency of the evidence supporting the fourth of these elements, whether it knew, or could have known through the exercise of reasonable diligence, of the violation of the fall protection rule. Either actual or constructive knowledge suffices to prove that the employer "knew," and when a supervisor has that knowledge it is imputed to the employer. Potelco, 194 Wn. App. at 439-40. An employer has constructive knowledge when a violative condition exists that could have been known through exercise of reasonable diligence. Erection Co. v. Dep't of Labor & Indus., 160 Wn. App. 194, 203, 248 P.3d 1085 (2011). " 'Reasonable diligence involves several factors, including an employer's obligation to inspect the work area, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence.' " Erection Co., 160 Wn. App. at 206-07 (quoting Kokosing Constr. Co. v. Occupational Safety & Hazard Review Comm'n, 232 F. App'x 510, 512 (6th Cir. 2007)).

Here, because the supervisor's knowledge is imputed to the employer, our analysis focuses on what was known or could have been known through the exercise of reasonable diligence by Cerna, PAS's foreman at the Sea-Tac project. The day before the accident, aware that there was no guardrail on the scaffold off of which Ortiz would shortly fall, Cerna had asked a general contractor to construct one. This was not done. At the beginning of their shift on

6

the day of the accident, Cerna gathered his supervisees to go over their assignments. At these meetings, in addition to making assignments, it was PAS's goal that supervisors inform workers of specific anticipated hazards; workers understood the meetings to serve that purpose as well. They met at the "lay-down area," located a floor beneath the work-site, where security equipment and other tools were kept. Among this equipment was personal fall protection gear. Assuming without checking that the general contractor had constructed a guardrail on the scaffold, Cerna assigned Ortiz and Hernandez to work on the scaffold. He did not direct them to bring personal protection gear such as a harness with them in the event that that the contractor had not constructed the guardrail as asked. Nor does the record indicate that he informed them he had requested that a guardrail be constructed, though at no point does testimony explicitly state that he did not.

Cerna accompanied Ortiz and Hernandez to the scaffold but because, he says, of the plastic sheeting it was covered in, he did not notice that the guardrail had not been installed. Despite the apparent lack of visibility, Cerna did not affirmatively double-check the existence of a guardrail. An hour or more into the shift, Ortiz fell from the scaffold.

PAS, on paper, had a system in place to prevent this sort of miscommunication and oversight: it marked elevated scaffolds with color-coded tags indicating what sort of safety gear was required. Green indicated the scaffold was safe without the use of personal safety equipment, yellow that

personal safety equipment was necessary, and red that the scaffold was unsafe and should not be used. But testimony supported that this system was either not used on the day of the accident or that no tag was readily visible. Ortiz testified that he did not see a yellow tag. Hernandez testified that he saw no yellow tag before the accident, but that "after the fall, somebody went and found it or found one." Cerna himself testified that he did not recall seeing a yellow tag on the scaffold on the day of Ortiz's fall.

Moreover, more generally, Hernandez testified that worker safety was not a central concern: "you know, at that point nobody paid attention to that safety stuff there. And, you know, it wasn't even written into the task to be performed that we signed for that night." He testified that outside of general warnings from supervisors to use safety gear on elevated worksites, he had never received a specific warning to use a harness on the scaffold at Sea-Tac. This is potentially explained by other testimony that the fall hazard here did not come into existence until demolition of the purlin ceiling near the scaffold was completed, though it is unclear exactly when that process finished.

This testimony supports the trial court's finding that PAS had knowledge of the violation or could have acquired that knowledge through the exercise of reasonable diligence. For days, the employees had been working without any fall protection and, at least by some point on the day before the accident, a fall hazard existed. Cerna had actual knowledge of the hazard the day before the

8

accident, and actual knowledge that his supervisees were not using personal fall protection on the day of the accident.

But we do not need to determine whether this means that Cerna actually knew of the violation on the day of the accident because, regardless, Cerna did not exercise reasonable diligence given his previous actual knowledge of the hazard. He therefore had constructive knowledge. He allowed his workers to go to the scaffold but did not check to ensure that the contractor had erected a guardrail. He did not inform his supervisees of the possible hazard and instructing them to bring personal safety equipment in case the guardrail had not yet been installed. Nor did he ensure that the employees were warned of the fall hazard by way of a yellow tag. Taking any of these actions might have remediated the existence of the violative condition, but Cerna took none of them. Viewing the evidence in the light most favorable to the Department, we conclude the Board's finding was supported by substantial evidence.[3]

By way of counterargument, PAS focuses heavily on its employees' training and awareness of the lack of a guardrail to demonstrate that it exercised

---

[3] The Department spends a portion of its brief asserting that the violation was in plain view, relying in large part on photographs of the scaffold taken after a guardrail had been erected in which the silhouette of the rail is visible through the plastic sheeting that drapes the platform. If the violation were in plain view, the IAJ could have found that PAS had constructive knowledge of it. Potelco, 194 Wn. App. at 439. Because we can and do affirm on the same theory relied on by the Board, we do not address this argument, which was not the basis of the Board's decision below. However, to the degree this theory was addressed at all, the IAJ appears to have found otherwise in its analysis section, saying that Cerna "was unable to see behind the poly plastic" and that "common sense dictates that he use some other method to inspect the work area" as a result.

9

reasonable diligence.[4] It frames the case as one in which "two highly experienced workers made bad decisions that were unquestionably contrary to their training." Ortiz and Hernandez admit to being aware of how to use personal fall protection equipment, aware of the policy that they should use it in the absence of a guardrail, and aware that harnesses and other such equipment were available at the lay-down area. The Department contests this evidence's relevance to the relevant element of the citation, and at a broader level contests the relevancy of PAS's safety policies as a whole. It relies on case law that an employers duties under WISHA are non-delegable " 'no matter how carefully the person or agency to whom the duty is attempted to be delegated is selected or how competent or reputable he or it may be.' " Ward v. Ceco Corp., 40 Wn. App. 619, 628-29, 699 P.2d 814 (1985) (quoting Guy v. Northwest Bible College, 64 Wn.2d 116, 119, 390 P.2d 708 (1964)). We agree that the employees' knowledge of the hazard in general, without more, does not inform determination of whether the employer knew of it. We do not need to decide whether an employer's policies can never be relevant to the employers' knowledge because

---

[4] In another counterargument, PAS asserts that we might review whether it was reasonably diligent de novo because neither statute nor rule requires it to verify that a general contractor did as asked. Therefore, it says, "[a]s a matter of law, the Board wrongfully placed a legal burden on PAS and Mr. Cerna to take an action that was not required by statute or regulation."

Statute requires that PAS exercise reasonable diligence. What constitutes reasonable diligence is a finding of fact for the trier of fact, reviewable for support by substantial evidence. Statute does, contrary to PAS's position, fail to impose a burden on PAS in this instance, even if it is not as explicit as PAS would prefer it to be.

even without considering PAS's policies, the evidence is sufficient to support the court's findings that PAS was aware.[5]

<u>Unpreventable Employee Misconduct</u>

PAS's second challenge goes to whether it met its burden to prove its affirmative defense of unpreventable employee misconduct. This defense requires PAS to show that its safety program is effective in writing and in practice. It therefore attempts to undermine the Board's finding that PAS's "measures to prevent the occurrence of the violation [were] inadequate due to ineffective enforcement practices including their lack of disciplinary actions for violations." We conclude that this finding, too, is supported by substantial evidence.

When cited for a violation of the WAC, an employer may plead as an affirmative defense that

> there [was] unpreventable employee misconduct that led to the violation, but the employer must show the existence of:

---

[5] In a similar vein, PAS protests that in the face of its policies, liability in this case would amount to "hold[ing] PAS strictly liable for [] safety violations because they could only have been discovered by exercising absolute vigilance of the workers and the worksite." It asserts, in substance, that to require supervisors to be aware of falling hazards in the workplace and warn their employees of those hazards runs afoul of a general requirement that "an employer's duty is qualified by the requirement that it be achievable rather than a mere vehicle for strict liability."

This is a misstatement of the standard. That the Department needs to prove knowledge is enough to demonstrate that the citation is not rooted in a strict liability theory. And to require PAS to protect its employees from falling hazards by exercising diligence to be aware of them in the first place is simply an accurate reflection of WISHA and the codes promulgated under it.

(i) A thorough safety program, including work rules, training, and equipment designed to prevent the violation;

(ii) Adequate communication of these rules to employees;

(iii) Steps to discover and correct violations of its safety rules; and

(iv) Effective enforcement of its safety program as written in practice and not just in theory.

RCW 49.17.120(5)(a). The fourth element requires that the employer show that employee misconduct was "an isolated occurrence and was not foreseeable." Pro-Active Home Builders, Inc. v. Dep't of Labor & Indus., 7 Wn. App. 2d 10, 20, 465 P.3d 375 (2018). As a whole, the affirmative defense applies in "situations in which employees disobey safety rules despite the employer's diligent communication and enforcement." Asplundh Tree Expert Co. v. Dep't of Labor & Indus., 145 Wash. App. 52, 62, 185 P.3d 646 (2008).

We look first to Hernandez's testimony that "you know, at that point nobody paid attention to that safety stuff there." If credible—a matter within the discretion of the trier of fact that we do not reweigh—this statement strongly supports the Board's finding. We view the evidence in the light most favorable to the prevailing party below: the Department. Shimmick, 12 Wn. App. 2d at 778. To view the evidence in the light most favorable to the Department is to find Hernandez's testimony credible.

But we consider more evidence than just this testimony. PAS's written safety procedures were, according to PAS's expert witness, industry outliers in how well developed they were. This is borne out by the procedures themselves. The accident prevention plan as a whole is nearly 500 pages long. Its fall

protection rules require that employees be trained, certified, and occasionally retrained in fall protection.

However, testimony and other evidence indicates that enforcement of PAS's safety procedures was inconsistent. As already mentioned, testimony, even from Cerna, supports that PAS's color-coded tag system was not consistently implemented. Personal protective equipment was not always used, even where necessary. And more generally, it appears that PAS's written procedures were not always followed. PAS's list of good safety habits includes conducting a daily pre-site task plan. No such plan appears to have been conducted on the day of the accident. And plans from the earlier days on the same project do not list the scaffold's lack of fall protection as a hazard, nor require the use of personal safety equipment, despite the possible existence of that hazard throughout at least some amount of work on the scaffold.

Furthermore, PAS's history of disciplining its employees is limited. As noted by the ALJ, the only two occasions on which PAs disciplined supervisors happened *after* injuries had occurred. This is not consistent with a workplace that strenuously enforces its regulations even before harm has been suffered.

We therefore conclude that substantial evidence supports the Board's finding that PAS's safety measures were inadequate because their enforcement practices, including lack of disciplinary actions for violations, were lax. As a

result, the Board correctly ruled against PAS's affirmative defense of unpreventable employee misconduct.[6]

We affirm.

WE CONCUR:

_Smith, C.J._

_Mann, J._          _Dwyer, J._

---

[6] PAS additionally assigns error to all findings 2-12 and conclusions of law 2-4. These are all the findings and conclusions made, save a conclusion pertaining to jurisdiction and a finding pertaining to the basic facts of the accident. PAS also "asserts the Board erred in all evidentiary rulings adverse to PAS."

As pointed out by the Department, however, PAS does not devote briefing to these assigned errors. The Department gestures to Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992), for the principle that appellate courts do not address assignments unsupported by argument. The Department is correct. We do not consider PAS's unargued assignments.